# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

JOSHLYN THOMAS,

       Plaintiff,

    v.

TRINITY INDUSTRIES, INC.,
a Delaware Corporation, and
TRINITY HIGHWAY PRODUCTS,
LLC, a Limited Liability Company,

       Defendants.

CIVIL ACTION NO.

1:18-CV-2976-CAP

## O R D E R

Guardrails line roads all across America, particularly heavily travelled thoroughfares such as Interstate 285 in DeKalb County, Georgia, just outside of Atlanta. This is a products liability action brought by the plaintiff, Joshlyn Thomas, after a guardrail amputated her leg during an accident on Interstate 285. Thomas has filed suit against the defendants Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively "Trinity") as manufacturers of the guardrail that injured her. She brings claims for breach of duty based on products liability and negligence (Count I), strict liability based on a design defect (Count II), strict liability based on a manufacturing defect (Count III), failure to properly install (Count IV), strict liability for failure to warn (Count V), negligence (Count VI), attorney

fees and expenses (Count VIII), and punitive damages (Count IX).[1]  This matter is currently before the court on the defendants' motion for summary judgment.  [Doc. No. 113].  The defendants have also filed several motions to exclude, strike, or limit expert testimony [Doc. Nos. 108, 111, 114, 116], as well as a motion for sanctions [Doc. No. 116].  The court will adjudicate all of these motions in this order.

## I.   Background

On May 31, 2016, at approximately 1:13 A.M, Joshlyn Thomas was driving along Interstate 285 West in DeKalb County, Georgia, travelling at approximately 75 mph.  [DSMF ¶¶ 1,3].[2]  The vehicle left the roadway, and

---

[1] The plaintiff's claim for breach of express and implied warranty (Count VII) was dismissed on November 1, 2018.  [Doc. No. 31].

[2] Citations that reference only paragraph numbers preceded by "DSMF" refer to the defendants' statements of material facts, [Doc. No. 113-2], or portions thereof, that are not disputed. Citations that reference only paragraph numbers preceded by "PSMF" refer to the plaintiffs' statement of material facts, [Doc. No. 128-1], or portions thereof, that are not disputed. Pursuant to the Local Rules of this court, each of the proponents' facts will be deemed admitted unless the other side "(i) directly refutes the [proponents'] fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the [proponents'] fact; or (iii) points out that the [proponents'] citation does not support the [proponents'] fact or that the [proponents'] fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2), NDGa. Where a factual assertion or portion thereof is properly disputed, the court will cite to the paragraph appearing in the proponents' statement of material fact; will view the material evidence and factual inferences in the light most favorable to

the brakes were engaged for only one second before the vehicle crashed into a section of guardrail. [*Id*. ¶3]. A guardrail entered the vehicle as a result of the impact and amputated Thomas's right leg. [*Id*. ¶3, PSMF ¶ 60]. She was transported via ambulance to Grady Memorial Hospital, where her blood alcohol level was determined to be .188. [DSMF ¶4].

Trinity supplies guardrails to the Georgia Department of Transportation ("DOT") and its chosen contractors, but is not responsible for installing these guardrails. [DSMF ¶6]. It is unknown who installed the guardrail that entered Thomas's vehicle and impaled her leg. [*Id*. ¶6]. The class of guardrail at issue in this case is the AASHTO[3] M180 Class A Type II guardrail. [*Id*. ¶11]. This w-beam guardrail, so-called because of its shape, is a non-proprietary product. [*Id*. ¶8]. The Georgia DOT lists nine different suppliers who manufacture and sell this particular type of guardrail. [*Id*. ¶11]. It is not unusual for guardrails manufactured by different companies to be commingled on one highway. [*Id*. ¶11]. A heat stamp on each guardrail panel identifies the manufacturer. [*Id*. ¶12]. Although a portion of the guardrail that severed Thomas's leg remains inside her car, the

the plaintiff; and will, where appropriate, also cite directly to the evidence supporting the court's resulting factual recitation.
[3] AASHTO refers to the American Association of State Highway and Transportation Officials.

identifying heat stamp is either unreadable because it is located on a folded portion of the guardrail, or it is missing, having been located on the portion of the guardrail that remained outside the vehicle and was not preserved at the scene of the accident.[4]  [*Id*. ¶13].  The heat stamp on the guardrail adjacent to this subject guardrail identifies it as having been manufactured by Central Fabricators during the 26th week of 2001.  [*Id*. ¶14].  Central Fabricators merged into Trinity Highway Products, LLC on August 1, 2007. [*Id*. ¶16].   However, neither Central Fabricators nor Trinity designed the guardrail at issue in this case.  [*Id*. ¶23].  Furthermore, there is no evidence that the subject guardrail had a design defect.  [*Id*. ¶23].  Thomas has also provided no evidence that Central Fabricators was aware of any alleged manufacturing defect, including a failure to meet the specified thickness, in the adjacent guardrail.  [*Id*. ¶26].

## II.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure authorizes summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating

---

[4] The court, following the practice of the parties, hereinafter refers to the guardrail that severed Thomas's leg as the "subject guardrail."

that no dispute as to any material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson*, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only whether there is such an issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The applicable substantive law will identify those facts that are material. *Id.* at 247. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. *Id.* Genuine disputes

5

are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* "Genuine" factual issues must have a real basis in the record. *See Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citations omitted).

## III. Analysis

"The sine qua non of a products liability claim, regardless of whether the plaintiff proceeds under a theory of strict liability or negligence, is a defect in the product." *Boswell v. Overhead Door Corp.*, 664 S.E.2d 262, 263 (Ga. Ct. App. 2008). In 1975, the Georgia Supreme Court determined that O.C.G.A. § 51-1-11 imposes strict liability for defective products. *Ctr. Chem. Co. v. Parzini*, 218 S.E.2d 580, 582 (Ga. 1975). *See also Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 672 (Ga. 1994). A plaintiff may proceed on a strict liability claim on one of three types of defects: manufacturing defects, defects in marketing or packaging, or design defects. *Id.* In the instant action, Thomas claims that that there was both a design and manufacturing defect in the subject guardrail. [Doc. No. 12 at 13, Amend. Compl. ¶46].

In addition to these strict liability claims, Thomas also claims that the guardrail was negligently designed and manufactured. [*Id.* at 14, Amend.

Compl. ¶46]. "[O]nly semantics distinguishes the cause of action for negligence and a cause of action pursuant to O.C.G.A. § 51-1-11." *Banks* at 674 n.3 (citation omitted). *See also Orkin Exterminating Co. Inc. v. Dawn Food Products*, 366 S.E.2d 792, 794 (Ga. Ct. App. 1988) (applying principles "established generally in product liability cases" to allegations of negligence). Proximate cause is a necessary element of Thomas's case, under both theories of strict liability and negligence. *Powell v. Harsco Corp.* 433 S.E.2d 608, 610 (Ga. Ct. App. 1993). "Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries there can be no recovery." *Talley v. City Tank Corp.,* 279 S.E.2d 264, 269 (Ga. Ct. App. 1981). For each theory of liability, the core questions are the same: "whether a product was defective, and if so, whether the defect was the proximate cause of a plaintiff's injury." *Varazo v. Keiser Corp.*, No. 1:16-cv-4228-WSD, 2018 WL 2938871, at *3 (N.D. Ga. June 12, 2018) (quoting *S K Hand Tool Corp. v. Lowman*, 479 S.E.2d 103, 106 (Ga. Ct. App. 1996)).

### A. Did Trinity manufacture the subject guardrail?

In Georgia, in order to prevail on a products liability claim for strict liability, the plaintiff "must prove that [the] defendant is the manufacturer of the property, that 'the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition

when sold [wa]s the proximate cause of the injury sustained.'" *Mosley v. JLG Industries, Inc.*, No. No. 7:03-CV-119 HL., 2005 WL 2293567, at * 5 (M.D. Ga. Sept. 20, 2005) (quoting O.C.G.A. § 51-1-11(b)(1)). For a negligence claim, the plaintiff must prove that there was a duty on the part of the defendant "to conform to a certain standard of conduct, for the protection of others against unreasonable risk," a failure to so conform, that the injury was connected to the conduct, and that loss or damage resulted from the conduct. *Id*.

Trinity argues that all of Thomas's claims must fail because she has not identified it as the manufacturer of the guardrail that entered her vehicle and amputated her leg. [Doc. No. 113-1 at 7]. It is undisputed that the heat stamp on the subject guardrail, which would conclusively identify the manufacturer, is either unreadable because it is located on the folded portion of the guardrail still inside Thomas's car, or is missing because it was located on the portion of the guardrail that remained outside the vehicle and was not preserved at the scene of the accident. [DSMF ¶13]. Thomas asserts, however, that "there is sufficient circumstantial evidence to allow the issue of whether Trinity/Central Fabricators manufactured the subject guardrail to be decided by the jury." [Doc. No. 128 at 10]. "The standard of proving proximate causation under Georgia law is by a preponderance of the

evidence." *Chapman v. American Cyanamid Co.*, 861 F.2d 1515, 1519 (11th Cir. 1988). Evidence may be either direct or circumstantial. *Id.*

Here, Thomas points the court to six pieces of circumstantial evidence that she believes are sufficient to survive summary judgment and send the case to the jury on the issue of whether Trinity manufactured the subject guardrail:

1. There are portions of two separate guardrail panels still lodged inside Ms. Thomas' vehicle (Exhibit 1, Schrum Depo at 26:16-19).

2. Dr. Kevin Schrum believes that the ruptured rail was manufactured by Central Fabricators (Exhibit 1, Schrum Depo at 27:17 – 28:25).

3. The heat stamp of the ruptured guardrail could not be ascertained as it was upside down in Ms. Thomas' vehicle (Exhibit 1, Schrum Depo at 27:12-16).

4. Excluding the end terminal cap, each section of guardrail at the scene was manufactured by Central Fabricators and had a Central Fabricators heat stamp, except for guardrail used to replace the guardrail damaged in the collision that was manufactured by Gregory Highway (Exhibit 1, Schrum Depo at 28:4-10).

5. All the Central Fabricators guardrail panels at the scene are from 2001, pre-date the May 31, 2016 crash, are consistent with the Google street view image from January 2015, and have roughly the same age in terms of their sheen (Exhibit 1, Schrum Depo at 28:10-15).

6. Excluding the new Gregory Highway guardrail and the non-standard end terminal cap rail with a cable attached to it, all

> of the guardrail in the area of the Thomas incident was
> installed from the same heat stamp (Exhibit 1, Schrum Depo
> at 28:16-21).

[Doc. No. 128 at 10-11].  Trinity counters that this evidence is thin.  [Doc.

No. 132 at 7-8].  In particular, it states that Thomas's "sole 'evidence' is

Schrum's ***belief*** that CF manufactured the subject guardrail because other

guardrail panels located near the crash site were manufactured by CF."  [*Id.*

at 7] (emphasis in original).

Like the plaintiffs in *Chapman*, Thomas cannot point with 100%

certainty to the manufacturer of the product that caused the injury.  In

*Chapman*, the plaintiff parents could not unequivocally state which of two

different companies (Lederle[5] and Wyeth Laboratories) made a vaccine that

led to their infant son's death.  In ruling that the parents had presented

sufficient circumstantial evidence to allow the case to proceed to a jury

against one of the companies (Lederle), the Eleventh Circuit looked at the

number of doses of the vaccine from each manufacturer that were in the

doctor's possession at the time of the child's immunization.  The court

concluded that at least 65 doses of the Lederle vaccine were present in the

doctor's office when the child was immunized, and this number was

---

[5] Lederle is a division of the named defendant American Cyanamid Co.

significantly higher than the possible number of present doses from Wyeth. Viewing the evidence in the light most favorable to the parents, the Eleventh Circuit determined that there was a genuine issue of material fact concerning whether Lederle supplied the fatal vaccine dose.

In the instant action, it is clear that a guardrail caused Thomas's injuries. Her expert, Dr. Kevin Schrum, visited the crash site on April 24, 2019, almost three years after the accident occurred, and examined ten guardrails at the scene. [Doc. No. 113-16 at 3, Schrum Report at 2]. Schrum has provided a table with the heat stamps of the ten guardrails at the scene of the accident at the time of his inspection:

**Table 2. Minimum Thicknesses and Strengths of In-Situ Guardrail at the Subject Crash Site**

| Location | GR Height (in) | Thickness (mm) | | | | | | Avg Strength (ksi) | | | | Stamp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Caliper | 1 | 2 | 3 | 4 | Avg | 1 | 2 | 3 | Avg | |
| 1 | 29.5 | 0.110 | 0.104 | 0.104 | 0.104 | 0.104 | 0.104 | 69.8 | 66.9 | 69.2 | 68.6 | GH M180 A2 A9502 23 16 |
| 2 | 28.25 | 0.109 | 0.104 | 0.108 | 0.108 | 0.108 | 0.107 | 69 2 | 68.0 | 74.5 | 70.6 | GH M180 A2 A9502 23 16 |
| 3 | 27 | 0.100 | 0.104 | 0.104 | 0.104 | 0.104 | 0.104 | 70.6 | 66.4 | 68.0 | 68.4 | CF M180 812993 01 26 A2 |
| 4 | 26.75 | 0.105 | 0.108 | 0.108 | 0.108 | 0.108 | 0.108 | 83.7 | 80.8 | 77.3 | 80.6 | CF M180 812993 01 26 A2 |
| 5 | 29.75 | 0.105 | 0.112 | 0.116 | 0.112 | 0.112 | 0.113 | 82 1 | 76.9 | 78.6 | 79.2 | CF M180 812993 01 26 A2 |
| 6 | 25.5 | 0.104 | 0.116 | 0.116 | 0.108 | 0.108 | 0.112 | 81 9 | 78.0 | 79.6 | 79.9 | CF M180 812993 01 26 A2 |
| 7 | 26 | 0.105 | 0.108 | 0.108 | 0.108 | 0.108 | 0.108 | 76 1 | 77.9 | 78.5 | 77.5 | CF M180 812993 01 26 A2 |
| 8 | 25.25 | 0.105 | 0.108 | 0.116 | 0.116 | 0.112 | 0.113 | 77 3 | 76.0 | 84.3 | 79.2 | CF M180 812993 01 26 A2 |
| 9 | 25.25 | 0.103 | 0.112 | 0.108 | 0.112 | 0.112 | 0.111 | 80 9 | 80.8 | 83.8 | 81.8 | CF M180 812993 01 26 A2 |
| 10 | 25.25 | 0.110 | 0.120 | 0.116 | 0.116 | 0.116 | 0.117 | 75.7 | 78.6 | 83.8 | 79.4 | CF M180 805564 ??? |

[*Id*. at 4, Schrum Report at 3]. The guardrails at Locations 3-9 were manufactured by Central Fabricators around 2001 (from the same heat,

having identical heat stamps).[6]  The guardrail at Location 10 was also

manufactured by Central Fabricators, but it is a different type of guardrail

than those in Locations 3-9.  The guardrail at Location 10 is an end

guardrail with a cable attached to it.  It is reasonable to infer that this is

why it has a different heat stamp from the guardrails in Locations 3-9,

because it is a different type of guardrail and thus manufactured in a

different production run.[7]  The guardrails in Locations 1 and 2 were

manufactured by Gregory Highway in 2016 (from the same heat, having

identical heat stamps).  These two Gregory Highway guardrails are those

that replaced the two that Thomas's vehicle hit.  [Doc. No. 128-3 at 9,

Schrum Dep. 8/5/2019 at 28:7 – 28:11].  Pieces of both guardrails that were

hit remain in the vehicle.  Thus, still inside the vehicle are part of the

---

[6] Defense expert Dr. Malcolm H. Ray explains that the manufacture date is contained within the heat stamp (i.e., CF M180 812993 **01 26** A2), with 01 representing the year of 2001 and 26 representing the 26th week of that year.  [Doc. No 113-11 at 12, Ray Report at 11].  At his deposition, he explains in further detail how the heat stamp is read to identify the manufacturer and manufacturing date.  [Doc. No. 112 at 78-80, Ray Dep. at 75:23 – 77:9].  There is no dispute between the parties that the heat stamp of CF M180 812993 01 26 A2 means a guardrail was manufactured by Central Fabricators during the 26th week of 2001.  [DSMF ¶14].

[7] In his deposition, Dr. Schrum explains that he put three question marks at the end of the heat stamp for the guardrail in Location 10 because the last portion of the heat stamp was unreadable.  [Doc. No. 110-1 at 29, Schrum Dep. 8/5/2019 at 29:2 – 29:8].

subject guardrail that amputated Thomas's leg and part of the guardrail that was located adjacent to the subject guardrail.   This adjacent guardrail that is still in the vehicle has the same heat stamp as the guardrails at Locations 3-9.  [Doc. No. 113-16 at 4, Schrum Report at 3; Doc No. 111-3 at 12, Ray Report at 12].[8]  So, of the ten guardrails at the scene of the accident, nine were definitively manufactured by Central Fabricators and eight of those nine were from the exact same heat.

Trinity contends that, unlike the plaintiffs in *Chapman*, Thomas has not presented actual evidence to prove who manufactured the product that caused her injury.  [Doc. No. 132 at 7].  Specifically, Trinity argues that Thomas "has no evidence of the sale of the subject guardrail, no evidence of the purchase of the subject guardrail, no information regarding who installed it (where and when), no evidence about whether the originally installed guardrail was replaced prior to the crash, and no invoices for the subject guardrail." [*Id*. at 8].  Trinity contrasts this to the evidence produced in *Chapman*, which included testimony from the doctor and several of his employees, as well as invoices for the purchases of the vaccine.

---

[8] This is also an undisputed fact.  [DSMF ¶14].

It makes sense that the plaintiffs in *Chapman* would need to produce this type of evidence because they were trying to recreate the conditions that existed at the time their son was immunized.  They filed their lawsuit on September 17, 1986, almost two years after their son passed away on September 21, 1984.  The Eleventh Circuit noted that "the record reflects that DTP vaccine was ordered on an 'as needed' basis, [and] the vaccine with the earliest expiration date was used first."  *Chapman* at 1520.  Thus, the vaccine doses that were in the doctor's possession at the time of the immunization would likely have been used by the time the lawsuit was filed two years later.  Guardrails, however, are not consumable items and are generally replaced only when needed.  Schrum has also testified that he reviewed a streetview image of the accident scene from January 2015, approximately five months prior to the date of the accident, and concluded that all of guardrails had the same sheen.  [Doc. No. 128-3 at 9, Schrum Dep. 8/5/19 at 28:10-28:15].  It is reasonable to infer that guardrails from different manufacturers, or guardrails that were installed on different dates, particularly years apart, would not have a uniform sheen. [9]  There is no

---

[9] The court notes that a different sheen is evident on the guardrails that replaced those hit by Thomas's car and those that were in place at the time of the accident, as evidenced in the photographs submitted by the defendants with Donald Tandy's report.  [Doc. No. 113-5 at 28, Tandy Report at 27].

indication in the record that any guardrails at the scene of the accident were replaced after the accident, other than the two guardrails that entered Thomas's vehicle and were replaced by guardrails from Gregory Highway. Thomas, therefore, unlike the plaintiffs in *Chapman*, was able to examine the remaining product sample, with the heat stamps that identify manufacturer and year of manufacture. Consequently, it is not necessary for her to produce documents concerning when the guardrails were purchased.[10] Furthermore, because the heat stamp on the subject guardrail is unreadable, there is no way for her to prove definitively when the subject guardrail was sold or purchased. The court finds that the circumstantial evidence produced by Thomas is sufficient to create a genuine issue of material fact on the issue of whether Central Fabricators, who merged into Trinity in 2007, manufactured the subject guardrail.

### B. Are the plaintiff's claims in strict liability and negligence for an alleged product defect barred by the statute of repose?

Georgia's products liability statute incorporates a statute of repose, which states in relevant part, "[n]o action shall be commenced pursuant to

---

[10] The date the guardrail was sold has no bearing on the identity of the manufacturer. It does, however, have bearing on Trinity's statute of repose defense, which the court discusses in Section III(B), *infra*.

this subsection with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." O.C.G.A. § 51-1-11(b)(2). "The ten-year statute of repose was enacted in order to address problems generated by the open-ended liability of manufacturers so as to eliminate stale claims and stabilize products liability underwriting." *Batten* at 212. "[S]trict liability actions filed more than ten years after the 'date of the first sale for use or consumption of ' the product are completely barred" by the statute of repose. *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 212 (Ga. 1994); *see also Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306-07 (11th Cir. 1999).

The Georgia Supreme Court has stated that "the statute of repose found in O.C.G.A. § 51–1–11(b)(2) begins to run when a finished product is sold as new to the intended consumer who is to receive the product." *Campbell v. Altec Industries, Inc.*, 707 S.E.2d 48, 48-9 (Ga. 2011). It is undisputed that Trinity sells guardrails to the Georgia DOT and the installation contractors are selected by the DOT. [DSMF ¶6]. Thus, the determinative date for the statute of repose would be the date that Trinity sold the subject guardrail to the DOT or installation contractor.

Trinity argues that if the court "accepts Schrum's guess that the subject guardrail was manufactured by CF based on some of the nearby guardrail

panels, it must also accept that the subject guardrail was manufactured and sold in 2001." [Doc. No. 132 at 8-9]. At the very least, Trinity argues, the court must accept that the subject guardrail was sold before the August 2007 merger of Central Fabricators into Trinity, because the surrounding guardrails all had Central Fabricators heat stamps, and those were not used after the merger. [*Id*. at 9]. Thomas disputes this, arguing that the fact that Trinity had no sales record for any guardrails with a heat stamp beginning with "CF" "does not establish as a matter of law when the subject guardrail was sold." [Doc. No. 128 at 15]. She stresses that Trinity cannot meet its burden of proving when the subject guardrail was sold, and therefore establishing the bar of the statute of repose, and that Trinity's reliance on the absence of sale records does not satisfy its burden. [*Id*. at 13-14]. Thomas also emphasizes that the lack of a sales record is not definitive proof. [*Id*. a 14-15].

The court agrees that the lack of a sales record is not definitive proof, but it disagrees that this is fatal to summary judgment. This case is similar to *Davis v. Brunswick Corp*., 854 F. Supp. 1574 (N.D. Ga. 1993),[11] in which

---

[11] Overrruled by *Lewis v. Brunswick Corp*.,107 F.3d 1494 (11th Cir. 1997) on its finding that common law claims are expressly preempted by the Federal Boat Safety Act. The instant action does not touch on this issue, and the

the plaintiff sued the defendant boat manufacturer for product liability following an accident in which the plaintiff was struck while swimming by a boat manufactured by the defendant.  The defendant sought summary judgment on the ground that the statute of repose barred the plaintiff's claims.  There was no evidence of the actual sale of the boat in the record; however, the defendant submitted deposition testimony from the company president about when the plaintiff took possession of the boat, as well as an affidavit concerning the date the boat was registered.  The plaintiff offered no evidence to dispute that provided by the defendants.  Initially, the court determined that the evidence presented was not conclusive to determine the sale date and thus there was an issue of material fact concerning when the statute of repose began to run.  However, on reconsideration, the court determined that "[w]hile it is true . . . that none of this evidence is completely conclusive, this court was incorrect in deeming such possible uncertainty as sufficient to constitute competent evidence designating 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 1584.

---

court relies on *Davis* for the issue of the statute of repose in products liability cases.

The court also looks to the construction of the statute itself for guidance.  The statute reads as follows: "[n]o action shall be commenced pursuant to this subsection with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury."  O.C.G.A. § 51-1-11(b)(2).  This language does not require a defendant to identify a specific sale date, just to sufficiently demonstrate that the sale date falls outside of this ten-year window.  In the instant action, like *Davis*, there is no conclusive evidence of the sale date which triggers the statute of repose.  Thomas filed her initial complaint on May 18, 2018.  Because the trigger date for the statute of repose runs from the date that the subject guardrail was sold to the Georgia DOT or the guardrail installer, it is clear that the sale date must be after May 18, 2008, in order for the statute of repose to not bar the plaintiff's claims.  Trinity has pointed the court to sufficient evidence to establish that the statute of repose applies.  The court summarizes this evidence as follows.

It is undisputed that the w-beam Central Fabricators guardrails located in the crash area were manufactured in the 26th week of 2001.[12]

---

[12] The manufacture date of the end terminal Central Fabricators guardrail at the accident scene is unknown. *See* Table 2 from Schrum's report on page 11, Section III(A), *supra*.

Trinity has provided the testimony of its expert, Dr. Ray, that industry practice is to sell a guardrail soon after it is manufactured. Dr. Ray testified:

> I'm telling you I know it was manufactured in the 26th week of 2001; they install them shortly thereafter. How long thereafter I don't know. It wasn't 10 years, though, and it wasn't 15 years. I don't have dates for that either, but that's just not, in my experience, a plausible explanation.

[Doc. No. 112 at 76, Ray Dep. at 73:16-73:21]. Dr. Ray is a professional engineer who has "been almost exclusively engaged in roadside safety research for over 30 years" and has "served as an expert witness for both plaintiffs and defendants in more than 120 litigation cases." [Doc. No. 111-3 at 3, Ray Report at 2]. In addition to his deposition testimony, Dr. Ray has also submitted an expert opinion that "[b]ased on the w-beam guardrail marking, the guardrail at the Thomas crash site was likely sold sometime late in 2001, 15 years before the Thomas crash, and installed shortly afterward." [Doc. No. 113-11 at 4, Ray Report at 3]. This evidence about industry practice is bolstered by the fact that the guardrails manufactured by Gregory Highway in 2016 were installed at the accident scene by no later than August 2017 (replacing the two guardrails that Thomas's vehicle hit).[13]

---

[13] It is possible that they were repaired earlier, but Google streetview images immediately after the accident only capture the accident scene at August

Trinity has also provided a picture of the subject guardrail that correlates a rust spot visible at the time of the accident in May 2016 with a rust spot visible on the guardrail in October 2014. [Doc. No. at 113-5 at 39, Tandy Report at 38]. In his expert report, Dr. Ray states that "the guardrail had an unusual rust spot that is visible in Google Street View photographs going back to 2012." [Doc. No. 113-11 at 17, Ray Report at 16]. Based on Dr. Ray and Tandy's reports, it is clear that the subject guardrail was installed at the accident scene at least by May 2012.[14] The presence of rust on the guardrail in May 2012 leads the court to infer that it was installed even earlier than May 2012, as the rust spot indicates that it had been exposed to the elements for a period of time prior to May 2012.

A Google streetview image of the accident scene from May 2008 shows that guardrails are already in place at that location approximately ten years

---

2016, and August 2017. In August 2016, the guardrails were not repaired. The guardrails were repaired by August 2017. [Doc. No. 113-11 at 17 at 19, Ray Report at 18; https://www.google.com/maps/@33.6723135,-84.3303283,3a,75y,284.62h,88.1t/data=!3m7!1e1!3m5!1s84zlWTVuLzywt -3Nmzs9mA!2e0!5s20170801T000000!7i13312!8i6656].

[14] In his report, Dr. Ray provides the internet address for this 2012 Google streetview. [Doc. No. 113-11 at 17, n.67, Ray Report at 16, n.67]. This image is dated as May 2012.

before Thomas filed her initial complaint on May 18, 2018.[15]  Trinity has also

produced a letter from the Georgia DOT indicating that the DOT had a bid

process in 2001 for installation of guardrail in 2001-2002 along the 100ft by

the Moreland Avenue exit on I-285W, where the accident occurred.  [Doc. No.

113-12 at 2].

The plaintiff's own evidence supports the finding that the subject

guardrail was sold and installed more than ten years prior to the filing of

Thomas's complaint.  For instance, Thomas's expert Dr. Schrum analyzed

the guardrails at the scene of the accident and recorded their heat stamps.

[Doc. No. 113-16 at 4, Schrum Report at 3, Table 2].  The heat stamps on the

guardrails adjacent to the subject guardrail all show that they were

manufactured by Central Fabricators in 2001.  Dr. Schrum testified that "it's

my opinion that all of that guardrail was installed from the same heat, with

only one exception, which was the last rail at the very end which is a stand- -

- a nonstandard rail, which has cable attached to it."  [Doc. No. 110-1 at 28,

Schrum Dep. 8/5/19 at 28:17 – 28:21].  This leads the court to the inference

that the eight w-beam guardrails with the same Central Fabricators heat

---

[15] The Google streetview image does not provide an exact date, just May
2008.  That leads the court to infer, however, that installation of guardrails
along that stretch of highway had to occur by no later than May 31, 2008.

stamp were installed at the same time, and that this installation date was sometime in 2001 or 2002, based on the Georgia DOT bid process. It seems unlikely that at some time between installation of guardrails at the scene in 2001-2002 and May 2012, when the subject guardrail is clearly identified via its unusual rust spot as being on the scene, that almost the entire stretch of guardrail at the accident scene had to be replaced at one time. This inference is supported by Schrum's testimony at his deposition. Schrum references the testimony of Dewayne Davis, the tow truck driver who responded to the accident, as follows: "The testimony, for example, of the tow truck driver, who was in this area a lot -- two or three times a week I think he said -- with crashes in this area, has never responded to a guardrail crash prior to this incident." [Doc. No. 110-1 at 33, Schrum Dep. 8/5/19 at 33: 7 – 33:11]. Even should a guardrail crash have occurred, it is unlikely that it would have required replacement of eight guardrails, particularly as the guardrails are located along the exit lane, where traffic is presumably lighter than in the main lanes of travel.

The evidence in the record supports a finding that the statute of repose applies to Thomas's claims. In Georgia, after the defendant produces evidence at summary judgment to establish that the statute of repose applies, the burden of production shifts to the plaintiff to produce admissible

evidence to the contrary or in support of an exception to the bar.  *Parks v. Hyundai Motor America, Inc.*, 668 S.E.2d 554, 558 (Ga. Ct. App. 2008).  *See also Tisdale v. City of Cumming*, 755 S.E.2d 833, 836 (Ga. Ct. App. 2014) (ruling that "Once the City produced evidence on summary judgment establishing that Tisdale's claims were barred [by a statute of repose], the burden of production shifted to Tisdale to produce some admissible evidence demonstrating that her claims were not untimely.")

The only evidence that Thomas points the court to is Dr. Ray's testimony that "he had seen no reliable document that established when the subject guardrail was sold" and "that there was no prohibition against a guardrail manufacturer selling guardrail in a year other than the year it was fabricated."  [Doc. No. 128 at 13-14].   Thomas did not depose anyone from Trinity or Central Fabricators [DSMF ¶31], even though Trinity identified Brian Smith, "the Vice President of Sales for Trinity Highway. Mr. Smith has information about the acquisition of Central Fabricators and Trinity Highway's practices with regard to the sale of w-beam guardrail, and general industry practices with regard to the sale of w-beam guardrail." [Doc. No. 113-14 at 24-25].  Trinity also identified Wade Malizia "the Vice President of Operations for Trinity Highway. Mr. Malizia has information about the acquisition of Central Fabricators, Trinity Highway's practices

with regard to the sale of w-beam guardrail, and general industry practices

with regard to the sale of w-beam guardrail." [*Id*.]. Thomas also did not

depose anyone from the Georgia DOT. [DSMF ¶31]. The evidence produced

by Thomas – that Dr. Ray did not know when the guardrail was sold or

installed – is not sufficient to create an issue of material fact on the issue of

when the subject guardrail was sold. "The mere existence of an uncertainty

as to the exact date, when no evidence would place it after [May 18, 2008],

therefore, is insufficient to prevent summary judgment on the issue of the

statute of repose." *Davis* at 1584.

The statute of repose plainly applies to products liability claims

sounding in negligence, but the statute contains an exception to the ten-year

limitation:

> [t]he limitation of paragraph (2) of subsection (b) of this Code
> section regarding bringing an action within ten years from the
> date of the first sale for use or consumption of personal property
> shall also apply to the commencement of an action claiming
> negligence of a manufacturer as the basis of liability, except an
> action seeking to recover from a manufacturer for injuries or
> damages arising out of the negligence of such manufacturer in
> manufacturing products which cause a disease or birth defect, or
> arising out of conduct which manifests a willful, reckless, or
> wanton disregard for life or property.

O.C.G.A. § 51-1-11(c). Where this exception applies, a claim based on the

sale of a defective product may proceed, notwithstanding the fact that the

action is initiated more than ten years from "the date of the first sale."

O.C.G.A. § 51–1–11(c). The Georgia courts have specified what constitutes

willful and wanton conduct: "[w]illful conduct is based on an actual intention

to do harm or inflict injury; wanton conduct is that which is so reckless or so

charged with indifference to the consequences . . . [so as to be the] equivalent

in spirit to actual intent." *Hendon v. DeKalb County*, 417 S.E.2d 705, 712

(Ga. Ct. App. 1992); *see also Batten*, 450 S.E.2d at 212. Thomas has the

burden of showing by a preponderance of the evidence that this exception

applies. *Ivy v. Ford Motor Co.*, 646 F.3d 769, 773 (11th Cir. 2011). "The

burden of showing something by a preponderance of the evidence . . . simply

requires the trier of fact to believe that the existence of a fact is more

probable than its nonexistence." *Concrete Pipe & Prods. of Cal., Inc. v.*

*Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 622 (1993).

In this case, Thomas has not pointed the court to any evidence that

Trinity acted with the actual intention of doing harm. Instead, she points

solely to Ray's testimony that "*if* the coupon samples"[16] of the subject

guardrail as analyzed by the plaintiff accurately reflects the thickness when

---

[16] Thomas's first expert, who did not provide a report or testify in this case, took coupon samples from the subject guardrail and sent them out for testing.

the galvanized zinc coating is still on there, then the product should never have been sold or "put out on the roadway." [PSMF ¶27, emphasis added]. It is undisputed that Thomas did not produce any documents in response to Trinity's October 5, 2018, request that she provide or identify any evidence to support the claim that Trinity acted in a willful or wanton manner. [DSMF ¶29]. Thomas also did not depose anyone at Trinity, Central Fabricators, or the Georgia DOT. [DSMF ¶31]. Perhaps if she had, she would have been able to support her allegation of willfulness or wantonness. As it stands, however, the record before this court does not evidence any willfulness or wantonness on the part of the defendants. Accordingly, the court finds that Thomas's strict liability and negligence claims for a defective product are barred by the statute of repose. Summary judgment is GRANTED on these claims.[17]

---

[17] The court also notes that it is undisputed that "[n]either Trinity nor Central Fabricators, Inc. designed the subject guardrail" [DSMF ¶23] and Thomas "acknowledges that there is insufficient evidence in the record to establish that either of the named Defendants or Central Fabricators designed the subject guardrail." [Doc. No. 128 at 15].

C.    **Negligent failure to warn**

The statute of repose does not apply to Thomas's negligence claim for failure to warn. *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 213 (Ga. 1994). [18] Trinity argues, however, that this claim must fail for several reasons. First, Trinity makes the argument that "expert testimony is necessary to show that an inadequate warning, or lack of warnings, was the proximate cause of the plaintiff's injury," [Doc. No. 113-1 at 22]. Thomas counters that expert testimony is not required for this type of claim. [Doc. No. 128 at 21-22]. The cases cited by Trinity are not on point for the proposition that expert testimony is always required. While expert testimony may be helpful to a plaintiff's case when alleging negligent failure to warn or establishing proximate cause, it is not required. *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 685- 86 (11th Cir. 1984) (finding that "there is no rule requiring expert testimony on certain issues" and "expert testimony labeling [the defendant's] conduct as negligent was not required" because the jury could have determined from the evidence presented that the defendant had some duty to warn.) *See also Silverstein v. Procter & Gamble Manufacturing Co.*,

---

[18] The Eleventh Circuit has ruled that strict liability claims for failure to warn are not excepted from the statute of repose. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1307 (11th Cir. 1999).

No. CV 108-003, 2009 WL 10678585, at *2 (S.D. Ga. Dec. 29, 2009) (finding that expert testimony is not required to prove causation in a products liability case "where a cause and effect relationship may be inferred by laymen based on common sense or human experience" (internal quotation omitted); *Thomas v. Hubtex Maschineanbau GmbH & Co KG*, No. 7:06-CV-81(HL), 2008 WL 4371977, at * 10 (M.D. Ga. Sep. 23, 2008)  (stating that for a failure to warn claim in "[i]n a products liability case, expert testimony may be required when the product is complex and technical in nature." (internal quotation omitted)).

Secondly, Trinity argues that Thomas cannot establish there was a manufacturing defect in the subject guardrail, thus there can be no correlating duty to warn.  [Doc. No. 113-1 at 16].   Thomas responds that she has established that the guardrail was too thin.  [Doc. No. 128 at 19]. Trinity counters that her contention that there was a manufacturing defect relies solely on the opinion of Dr. Schrum, and Trinity has moved this court to exclude Schrum's opinion on this issue as unreliable.  [Doc. No. 132 at 10].[19]  However, the court need not reach the issue of Schrum's testimony.

---

[19] Trinity filed a motion to limit Dr. Schrum's expert testimony.  [Doc. No. 111].

Thomas's claim fails because there is no evidence Trinity knew of any defect, and Trinity had no duty even if there was a manufacturing defect.

"As with any negligence claim, a negligent failure to warn claim requires that a plaintiff prove the elements of duty, breach, and causation." *Thomas* at *9. "Under Georgia law, a manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of its product." *Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284, 289 (11th Cir. 1994). As an initial matter, the plaintiff must show that the manufacturer of the product knew, or reasonably should have known, there was a danger in using its products. *Batten,* 450 S.E.2d at 211. Whether a legal duty to warn exists is a matter for the court. *Thornton* at 289.

Assuming, arguendo, that there was a manufacturing defect in the subject guardrail, Thomas has presented no evidence that Trinity either knew or should have known about the defect. She points solely to the testimony of Dr. Ray "that at some point the thinness of a guardrail can cause it to become unsafe." [Doc. No. 128 at 19]. She provides nothing to suggest, however, that Trinity knew the guardrail was too thin, or that its guardrails somehow get thinner over time while they sit on the side of the highway. In her response to Trinity's statement of material facts, she admits that "Plaintiff has presented no evidence that Central Fabricators

knew of any alleged manufacturing defect (failure to meet thickness specifications)." [DSMF ¶26]. Again, Thomas did not depose anyone at either Trinity or Central Fabricators. This does not help her claim. A failure to warn claim requires actual or constructive knowledge on the part of the defendant. *Batten* at 724. *See also Moseley v. Carnival Corp.*, 593 F. App'x 890, 893 (11th Cir. 2014) (affirming the district court's dismissal of the plaintiff's negligent failure to warn claim because there were no factual allegations to support the "critical element" that the defendant knew or should have known of the danger).

Further, even if Trinity had known of such a defect, or could reasonably have foreseen that use of the guardrail might result in some non-obvious or unknown danger, it had no duty to warn Thomas. A duty to warn may be owed to consumers or purchasers of a product, as well as reasonably foreseeable users and third parties. *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 645 (Ga. 2016) Although Thomas may be a reasonably foreseeable user or third party, the Georgia Supreme Court has noted that the analysis of whether a duty is owed also takes public policy into consideration. *Id*. The court concluded that it would be "unreasonable to impose a duty" on a company that manufactured asbestos-laden water pipes to warn all children of its employees, or members of the public who may have

been exposed to asbestos-laden clothing worn by the employees, because "the mechanism and scope of such warnings would be endless." *Id*.  The court in *Reichwaldt v. General Motors LLC* applied this same reasoning in ruling that General Motors LLC did not have a duty to warn reasonably foreseeable third-parties about a dangerous fuel tank system in one of its trucks.  304 F.Supp.3d 1312, 1317 (N.D.Ga. 2018).  That court stated that "[i]t would be impractical, if not impossible, to fulfill this purported duty to warn. It is difficult to imagine the manner in which Old GM would have been able to make such a warning, and it would be unreasonable to impose such a duty." *Id*.  The court ruled that "the duty to warn under Georgia law does not extend to the Plaintiff in this case, who was one of the countless third-party bystanders who could come into the vicinity of contact with the CK truck." *Id*. at 1319.

This court likewise finds that it would be impractical, if not impossible, for Trinity to fulfill a duty to warn the general public.  In this case, Trinity sells the guardrails to the Georgia DOT, who then contracts with installers to place them along the roadways.  It is undisputed that Georgia DOT buys guardrails from nine different manufacturers, and that guardrails from different manufacturers may be co-mingled along a roadway.  There is no indication in the record that Trinity knows where its

guardrails will be installed.  Further, many guardrails are installed along interstates and highways which see a large portion of interstate and non-local travel.  Thus, like in *Certainteed*, "the mechanism and scope of such warnings would be endless."

Thomas argues that Trinity had a duty warn the Georgia DOT and/or the guardrail installer.  She asserts that it is the defendants' responsibility to provide evidence "that failure to comply with the thickness requirements of AASHTO M180 is a hazard of which those in the trade are aware."  [Doc. No. 128 at 20].  But this argument misunderstands the defendants' burden on summary judgment.  As explained in Section II, *supra*, the moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   The burden is not on the defendants "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof."  *Id*.  Furthermore, the Georgia DOT and guardrail installers are sophisticated users and learned intermediaries of the defendants' products.  "The 'sophisticated user' or 'learned intermediary' doctrine relieves a product manufacturer or supplier of this duty to warn the ultimate user where there

33

is an intermediary with knowledge of the hazard." *Parker v. Schmiede Mach. & Tool Corp.*, 445 F. App'x 231, 234 (11th Cir. 2011). *See also Dozier Crane & Mach., Inc. v. Gibson,* 644 S.E.2d 333, 335–36 (Ga. Ct. App. 2007) ("Under the learned intermediary doctrine, a manufacturer is not normally required to directly warn the ultimate consumer of a known risk if there is a learned intermediary between the manufacturer and the ultimate consumer."). "Where the product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." *Eyster v. Borg–Warner Corp.,* 206 S.E.2d 668, 670 (Ga. Ct. App. 1974) (quotation omitted) (affirming directed verdict for manufacturer where the hazard "was one commonly known to those in the trade"). Dr. Ray stated in his report that Georgia DOT "is responsible for developing its own standard plans and specifications to be used in highway design and construction and these standard plans and specifications are reviewed and approved by the FHWA Georgia Division Office." [Doc. No. 113-11 at 3, Ray Report at 2]. It is undisputed that Trinity does not install the guardrails it supplies to the Georgia DOT and the contractors selected by the DOT. [DSMF ¶6]. Thus, the court finds that Trinity did not have a duty to warn either the Georgia DOT or the

installation contractors.[20]  Summary judgment is therefore GRANTED on the plaintiff's negligent failure to warn claim.

### D. The claims for failure to properly install (Count IV), attorney's fees and expenses (Count VIII), and punitive damages (Count IX).

It is undisputed that Trinity and Central Fabricators do not install guardrail, and that there is no evidence that Trinity installed the subject guardrail.  [DSMF ¶6].  Thus, Trinity is granted summary judgment on Thomas's claim for failure to properly install the subject guardrail.

Thomas seeks attorney fees pursuant to O.C.G.A. § 13-6-11 because "Trinity Industries has acted in bad faith, been stubbornly litigious and/or have caused the Plaintiff unnecessary trouble and expense."  [Doc. No. 12 at 43, Amend. Compl. ¶161].  However, "[a]n award of attorney fees and expenses of litigation under O.C.G.A. § 13-6-11 is ancillary . . . Where, as here, the plaintiff suffers a defense verdict, he is not entitled to recover attorney fees pursuant to O.C.G.A. § 13-6-11."  *Lee v. Georgia Power Co.*, 675 S.E.2d 465, 468 (Ga. Ct. App. 2009).  *See also Miller v. Star Packaging Corp.*, No. 1:10-CV-3012-SCJ, 2012 WL 12897084, at *7 (N.D.Ga. Jan. 27,

---

[20] The district court for the Middle District of Florida likewise found that the state DOT was a sophisticated user of "guardrail systems, familiar with the protocols for their installation, inspection and repair."  *Pike v. Trinity Indus., Inc.*, 34 F. Supp. 3d 1193, 1194 (M.D. Fl. 2014),

2012) (finding summary judgment appropriate on the plaintiff's claim for attorney fees under O.C.G.A. § 13-6-11 because the court had granted summary judgment on the plaintiff's other claims).  Accordingly, the court finds that Thomas is not entitled to attorney fees in this action.

It is the law in Georgia that "[a] claim for punitive damages cannot stand alone." *Thysis, Inc. v. Chemron Corp.*, No. 1:08-cv-03879-SCJ, 2011 WL 13162410, at *5 (N.D. Ga. August 25, 2011).  The court having granted summary judgment on the plaintiffs' other claims, Thomas is also not entitled to punitive damages.

## IV.    The defendants' motions to exclude, strike, or limit expert testimony [Doc. No. 108, 111, 114, 116], and motion for sanctions [Doc. No. 116]

Trinity has filed several motions seeking to strike, exclude, or limit the plaintiff's expert testimony.   Two of these motions relate to the expert report and testimony of Thomas's expert Audrey Cowart.  Cowart is a life care planner retained by Thomas to forecast Thomas's future medical needs and costs.  [Doc. No. 109 at 4, Doc. No. 123 at 2].  Cowart prepared a preliminary Life Care Plan that "projects Plaintiff's future costs resulting from her injuries at more than $1.1 million."  [Doc. No. 114-1 at 3].  Trinity moves to "exclude or strike the preliminary Life Care Plan of Plaintiff's expert, Audrey Cowart, and preclude her from testifying to any of the conclusions

and opinions contained therein." [Doc. No. 108 at 1]. It also argues that Cowart does not have the medical background required to opine on future medical care, and that she did not consult any physicians, including Thomas's physicians, in formulating her opinion. [Doc. No. 114-1 at 2].

As the parties state in their briefing on Trinity's two motions concerning Cowart, Cowart's report and testimony are directed to the trier of fact, and thus are not applicable for the determination of summary judgment.[21] The court having determined that summary judgment is appropriate on all of Thomas's claims, Trinity's motions to exclude or strike the preliminary expert report and testimony of Audrey Cowart are DENIED AS MOOT. [Doc. Nos. 108, 114].

Trinity has also filed a motion seeking to limit the testimony of Thomas's expert Kevin Schrum. [Doc. No. 111]. In particular, Trinity asks the court to preclude Schrum "from offering any testimony concerning the thickness of the subject guardrail panel, its failure to meet AASHTO M180 specifications, the impact conditions of Thomas's crash, or warnings and alleged design defects." [Doc. No. 111-1 at 3]. In Section III(B), *supra*, the court has found that the statute of repose applies to Thomas's strict liability

---

[21] The parties dispute whether the testimony and report would be beneficial to the trier of fact. [Doc. No. 109 at 9, Doc. No. 115 at 15].

and negligence claims for alleged defects in the subject guardrail.  The court has also granted Trinity summary judgment on Thomas's negligent failure to warn claim.  Accordingly, Trinity's motion to limit Schrum's expert testimony is DENIED AS MOOT.  [Doc. No. 111].

In another motion, Trinity seeks to exclude supplemental reports from Cowart and Schrum that it argues are untimely.  [Doc. No. 116].  Trinity also argues that these reports are not actually supplemental reports because "the supplements go far beyond correcting inaccuracies or adding opinions based on information that was not available when the initial reports were issued."  [Doc. No. 116-1 at 7].  Thomas counters that the supplemental reports were timely filed and that they address the same topics as the initial reports [Doc. No. 126 at 16-17].  This motion is also DENIED AS MOOT. [Doc. No. 116].

Trinity seeks sanctions against Thomas for not complying with the expert disclosure deadline.  [*Id*. at 10].  It asks the court to "strike Plaintiff's Complaint for Plaintiff's willful delay," or at the very least, pay Trinity's attorney fees associated with filing the motion to exclude and for sanctions. [*Id*. at 11].  In *Wouters v. Martin Cty., Fla.,* 9 F.3d 924, 933 (11th Cir. 1993), the Eleventh Circuit stated that "[t]he trial court's discretion regarding discovery sanctions is not unbridled. We have consistently held that while

district courts have broad powers under the rules to impose sanctions . . . ,
dismissal is justified only in extreme circumstances and as a last resort."
(citations omitted).   The court does not find the circumstance in this case to
rise to that level.   Dismissal of the complaint would be an extreme sanction.
The court has previously found a lack of due digiligence on the part of
Thomas's counsel [Doc. No. 50 at 2], however, "[t]he decision to dismiss a
claim, like the decision to enter a default judgment, ought to be a last
resort—ordered only if noncompliance with discovery orders is due to willful
or bad faith disregard for those orders."   *Cox v. American Cast Iron Pipe Co.*,
784 F.2d 1546, 1556 (11th Cir. 1986).   The court therefore declines to dismiss
the complaint as a sanction, and the court further declines to require
Thomas to pay Trinity the attorney fees associated with the motion.
Trinity's motion for sanctions is DENIED.   [Doc. No. 116].

## V.    Conclusion

The defendants' motion for summary judgment is GRANTED.   [Doc.
No. 113].   The defendants' motions to exclude, strike, or limit expert
testimony are DENIED AS MOOT.   [Doc. Nos. 108, 111, 114, 116].   The
defendants' motion for sanctions is DENIED.   [Doc. No. 116].   As no matters
remain pending before this court, the clerk is DIRECTED to close this case.

39

**SO ORDERED** this 19th  day of August, 2020.

/s/CHARLES A. PANNELL, JR.
CHARLES A. PANNELL, JR.
United States District Judge